STATE OF NORTH CAROLINA v. WILLIAM RANNELS, A/K/A BILLY REYNOLDS, A/K/A WILLIAM TENT

No. 26A91

(Filed 4 June 1993)

**1. Constitutional Law § 344 (NCI4th)— excusal of prospective jurors—unrecorded bench conferences before trial—no constitutional violation**

Defendant's unwaivable right to be present at all stages of his capital trial was not violated by the trial court's excusal of jury pool members after private, unrecorded bench conferences where these prospective jurors were excused on the beginning day of the session before any case had been called for trial.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**2. Jury §§ 150, 223 (NCI4th)— death penalty views—ambiguous answers—excusal for cause—refusal to permit rehabilitation—life sentence—harmless error**

Assuming that it was error for the trial court not to permit the defendant in a capital trial to attempt to rehabilitate a juror who was excused for cause because of his views on capital punishment after having given ambiguous responses to *voir dire* questioning about the death penalty, this error was harmless because defendant received a life sentence. The improper excusal of a juror in violation of the principles of *Witherspoon v. Illinois*, 391 U.S. 510, and *Wainwright v. Witt*, 469 U.S. 412, affects only the sentencing proceeding and not

STATE v. RANNELS

[333 N.C. 644 (1993)]

the determination of defendant's guilt, and any error relating to such an excusal is harmless unless defendant receives a death sentence which, absent the error, would be sustained on appeal.

**Am Jur 2d, Jury § 290.**

**Comment note—beliefs regarding capital punishment as disqualifying juror in capital cases-post-Witherspoon cases. 39 ALR3d 550.**

3. **Jury § 79 (NCI4th)— requiring excused juror to observe trial— no denial of impartial jury**

Defendant was not denied a fair and impartial jury when the trial court excused a prospective juror but required him to sit on the front row as a spectator during the trial after the juror expressed reservations about jury duty because of his concern that the trial might interfere with his plans to begin nursing school at the end of the month; the district attorney assured the juror that the trial would not go to the end of the month; and the juror nevertheless doubted that he could give the case the attention it deserved because his plans to attend school would "still [be] in the back of my mind." Defendant's contention that the trial court's treatment of this juror "chilled" the honest responses of other members of the venire was not substantiated by the record and constitutes mere speculation.

**Am Jur 2d, Jury §§ 195 et seq.**

4. **Evidence and Witnesses § 294 (NCI4th)— other crimes, wrongs or acts—driving while impaired—refusal of breathalyzer— admissibility on voluntariness of confession ·**

In a prosecution for first degree murder and armed robbery, testimony by Virginia police officers involved in defendant's apprehension that defendant was charged with driving while impaired and that defendant refused a breathalyzer test tended ultimately to show the circumstances under which defendant's confession was made and was thus relevant and admissible under Evidence Rule 404(b) on the issues of the voluntariness and credibility of the confession. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence § 333.**

STATE v. RANNELS

[333 N.C. 644 (1993)]

5. **Evidence and Witnesses §§ 294, 368 (NCI4th)— other crimes, wrongs or acts—theft of vehicle and gun—striking of girlfriend—admissibility to show guilt**

In a prosecution for first degree murder and armed robbery, testimony by Virginia police officers involved in defendant's apprehension that defendant stole the vehicle in which he was riding, that defendant struck his girlfriend when she told him she had left her purse in the victim's truck, and that defendant stole the .22 caliber pistol with which he shot the victim was admissible under Evidence Rule 404(b) to prove defendant's guilt of the crimes charged. Defendant's theft of the car and beating of his girlfriend for leaving her purse in the victim's truck both bear on defendant's consciousness of guilt, and defendant's theft of the murder weapon tends to prove not only that he possessed it but the circumstances under which he acquired it.

**Am Jur 2d, Burglary § 63; Evidence § 333.**

**Admissibility in robbery prosecution of evidence of other robberies. 42 ALR2d 854.**

6. **Conspiracy § 33 (NCI4th)— conspiracy to rob—sufficiency of evidence**

The evidence was sufficient to establish a criminal conspiracy on the part of defendant and his girlfriend to rob the victim where an officer testified that defendant told him that he and his girlfriend went to a bar "to set this guy up . . . so they could rob him"; a second officer testified that defendant told him that he and his girlfriend planned on robbing a man at a bar, they went to the bar and met the man, after a while the girlfriend and the man left the bar, and defendant followed them as they drove off; and another witness testified that he observed defendant and his girlfriend engage the victim in conversation at a lounge and leave the lounge with the victim.

**Am Jur 2d, Conspiracy §§ 45-48.**

7. **Robbery § 4.3 (NCI3d)— armed robbery—sufficiency of evidence**

The evidence was sufficient to support defendant's conviction of armed robbery of a murder victim, although defendant's confession contained no mention of the robbery of the victim, where the confession did not deny that defendant robbed the

victim but was merely silent on the subject; according to defendant's confession, he and his girlfriend lured the victim from a lounge for the purpose of robbing him, and defendant later shot the victim to death with a .22 caliber pistol at a secluded spot where he had been led by either defendant or his girlfriend; and there was evidence that the victim habitually carried large amounts of currency in his billfold and pockets but was found dead with no billfold on his person, with one of his front pockets turned inside out and his back left pocket "loose," and with only a wristwatch on his wrist and a few coins in his right front pants pocket.

**Am Jur 2d, Robbery §§ 62 et seq.**

8. **Homicide § 256 (NCI4th) — first degree murder — premeditation and deliberation — sufficiency of evidence contradicting defendant's confession**

The State's evidence was sufficient to support defendant's conviction of first degree murder on the theory of premeditation and deliberation, although defendant stated in his confession offered into evidence by the State that he shot the victim in a fit of anger because the victim fondled defendant's girlfriend, where the State presented evidence tending to show that defendant and his girlfriend planned to rob the victim after the girlfriend lured the victim to a secluded spot presumably with the promise of sexual favors; in preparation for the robbery, defendant loaded a .22 caliber pistol and placed it where it would be available at the time of the robbery; the victim's dead body was found underneath the steering wheel of his truck with a glass between his legs and a burned down cigarette between two fingers of his left hand; the fatal wound to the victim's left temple was fired from a distance of two to three inches; when defendant learned his girlfriend had left her purse in the victim's truck, he beat her and left her; and when defendant was told after his arrest that his girlfriend was in jail, his attitude was cavalier, and he expressed a total lack of concern or affection for her. The State's evidence belies defendant's pretrial version of how the murder occurred and constitutes evidence that the killing was not suddenly provoked but was carefully planned and executed.

**Am Jur 2d, Homicide §§ 437 et seq.**

STATE v. RANNELS

[333 N.C. 644 (1993)]

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation" as elements of murder in the first degree. 18 ALR4th 961.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

9. **Homicide § 488 (NCI4th)— first degree murder—when intent to kill formed—instructions**

The trial court in a first degree murder prosecution did not err in refusing to give defendant's requested instruction that "the intent to kill cannot occur simultaneously with the killing" where the court's charge distinguished an intent to kill formed "under the influence of some suddenly aroused violent passion" from the intent to kill formed after premeditation and deliberation and thus conformed in substance with that requested by defendant.

**Am Jur 2d, Homicide §§ 500, 501.**

10. **Homicide § 727 (NCI4th)— first degree murder—felony murder and premeditation specified—separate punishment for underlying felony**

Where the jury specified in its verdict that it found defendant guilty of first degree murder on theories of both felony murder and premeditation and deliberation, and the jury also found defendant guilty of the underlying felony of armed robbery, the merger rule did not apply, and it was proper for the trial court to sentence defendant on both the murder conviction and the armed robbery conviction.

**Am Jur 2d, Homicide § 542.**

11. **Criminal Law § 964 (NCI4th)— motion for appropriate relief— jurisdiction of trial court**

Defendant's motion for appropriate relief must first be determined in the superior court where the motion was filed in the trial court on 30 August 1989 after the judgments against defendant were entered and his notice of appeal was given on 22 August 1989; the jurisdiction of the trial court had not been divested under N.C.G.S. § 15A-1448(a)(3) at the time the motion was filed; and the motion was thus not cognizable in the appellate division under N.C.G.S. § 15A-1418.

**Am Jur 2d, Coram Nobis and Allied Statutory Remedies §§ 53 et seq.**

**Application of civil or criminal procedural rules in federal court proceeding on motion in nature of writ of error coram nobis.**

Justices MEYER and PARKER did not participate in the consideration or decision of this case.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Brown, J., at the 14 August 1990 Criminal Session of Superior Court, Pitt County, upon defendant's conviction by a jury of murder in the first degree. Defendant's motion to bypass the Court of Appeals as to convictions and sentences on lesser charges was allowed pursuant to N.C.G.S. § 7A-31(b). Heard in the Supreme Court 10 February 1992.

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*John M. Savage for defendant-appellant.*

EXUM, Chief Justice.

Defendant was properly indicted for murder in the first degree, armed robbery, and conspiracy to commit armed robbery. The jury found defendant guilty as charged. His conviction of murder in the first degree was based upon theories of both felony murder and premeditation and deliberation. After the capital sentencing phase of the trial, because the jury was unable to reach a unanimous verdict as to punishment, the trial court, pursuant to N.C.G.S. § 15A-2000(b), sentenced defendant to life imprisonment. We find no error in defendant's trial.

I.

Evidence presented by the State, which included two voluntary, *Mirandized* pretrial statements given by defendant to investigating officers, tended to show the following: Defendant and his girlfriend, Linda Lopez, planned on 9 June 1989 to rob a man at a lounge in the Ramada Inn on Greenville Boulevard in Greenville, North Carolina. The plans involved "setting up" the man, apparently by using Lopez to entice him away from the lounge.

Defendant loaded a .22 caliber pistol and put it in Lopez's purse. Both defendant and Lopez then went to the lounge and met the man, Richard M. Gaddy, Sr., whom they intended to rob. Lopez began talking to Gaddy. She enticed him to leave with her in his truck. Defendant, according to one of his statements, followed in his car. According to the other statement, Lopez and the victim followed defendant.

Alfred Melofsky, food and beverage manager for the Ramada Inn, observed defendant, Lopez and Gaddy in the lounge during the evening of 9 June 1989 between 9 and 10 p.m. They were talking loudly. Melofsky observed all three leave the lounge around 10 p.m. Lopez was hanging on Gaddy's right arm and defendant walked on Gaddy's left side. Gaddy was carrying a glass he had taken from the lounge.

Both vehicles went to a secluded spot near the bar. According to defendant's statements, he got out of his car and went to the truck. He saw Gaddy fondling his girlfriend, became angry and reached for Gaddy. Gaddy tried to defend himself and "struck at" defendant with his left elbow. This angered defendant further. Defendant then got the .22 pistol out of Lopez's purse and shot Gaddy to death.

According to defendant's statements, he and Lopez then returned to the motel where they were staying. Lopez remembered that she had left her purse in Gaddy's truck. Defendant became angry again and told investigators that he "beat the hell out of the bitch." Defendant drove away, leaving Lopez. When told by investigators after his arrest in Virginia on 29 June 1989 that Lopez was in jail, defendant replied, "F---k her, I'll get another [vulgarity omitted], it's no problem."

A Greenville Police Sergeant, C. E. Weatherington, responding to a call on 10 June 1989, went to the location where Gaddy's truck had been discovered by others. Gaddy was in the truck, apparently dead, with a bullet wound in his left temple, sitting under the steering wheel and lying "over to the right." Gaddy had a glass between his legs and a burned-down cigarette between two fingers of his left hand. His front left pants pocket was turned inside out, and a dime was on the pavement under the driver's door. A woman's purse was under his head.

Autopsy revealed that Gaddy died from the gunshot wound to his left temple. Noting gray-black, sooty material and stippling around the wound, Dr. Page Hudson, a forensic pathologist who performed the autopsy, believed the pistol was fired "just a few inches away" from Gaddy's head.

After the autopsy, Gaddy's clothes were given to Police Officer John Baker, who was assisting in the investigation. Baker found no wallet or money in the clothes. Baker had found no wallet in the truck when he searched it earlier. According to Gaddy's son, Gaddy "always carried right much money on him, mostly cash money. He did not deal a whole lot with checks. He kept his billfold in his left back pocket, and he also kept money in his pockets. He always had money on him. He always had his wallet. And he had to have his wallet because he kept his DuPont pass in it, and in order to get in DuPont you have to show them your pass and . . . he carried it daily."

Fingerprints lifted from the truck matched those of Lopez. In the purse found in the truck under the victim's head, officers found a motel receipt for a room at the Cricket Inn in Greenville and Lopez's identification card. When they searched this room they discovered a beer can bearing a latent fingerprint matching fingerprint impressions later taken from defendant.

Defendant was arrested in Virginia on 29 June 1989 after a Virginia police officer stopped to investigate an apparent collision between the car defendant was driving and a median guard rail. The officer noticed a rag wrapped around the steering column, indicating to him that the car was possibly stolen. He also noticed the odor of alcohol. When the officer asked defendant to cut the engine, defendant replied, "F--k you." When the officer asked defendant to get out of the vehicle, defendant attempted to bolt. The officer caught defendant, pinned him against the car hood, and radioed for assistance. A license plate check subsequently revealed the car had been stolen in North Carolina. The officer said to defendant, "Sir, you are under arrest for auto theft." Defendant replied, "Okay, if you want to know, I stole the f-----g car." In a subsequent search of the car officers found a red shoulder bag containing ammunition, including some .9 millimeter and .22 caliber shells.

The arresting officer, Ronald Smith, Sr., read the *Miranda* warnings to defendant and asked for defendant's name. Defendant

gave his name as William Tent. When Officer Smith and defendant arrived at the Public Safety Building for Henrico County, Officer Smith read Virginia's "implied consent law" to determine whether defendant would submit to a breathalyzer test. Defendant said he would take no tests whatsoever.

While waiting for a magistrate to arrive to process defendant's refusal to take the breathalyzer, defendant divulged that he was wanted for murder in North Carolina. Officer Smith again read defendant the *Miranda* warnings and told defendant that a name check through the National Criminal Investigations Service did not reveal that defendant was wanted. Defendant then gave his name as William Rannels. Another name check under this name confirmed that defendant was wanted in Greenville, North Carolina, for murder.

Defendant then gave Officer Smith a statement describing the "set-up" and his killing of Mr. Gaddy. He gave another similar statement to Virginia Police Officer Francis Curran, III, who remained with defendant while Officer Smith left the room temporarily. Both statements were recounted to the jury.

II.

[1]  Defendant first contends his constitutional rights were abrogated when the trial court held private, unrecorded, side-bar conferences with a number of jury pool members. Because these conferences took place prior to the commencement of defendant's trial, we conclude no error, constitutional or otherwise, was committed.

The record reflects the trial court on 14 August 1990 first announced the commencement of the criminal session and welcomed the pool of potential jurors. The court then acknowledged the names of five potential jurors who had requested to speak with the court about their jury service. The court held unrecorded bench conferences with the five jurors and excused three of the five. At this point the trial court authorized the clerk to administer the oath to the jury pool. The court then authorized that the calendar for the session be called. After the calendar, which included defendant's case, was called, the court was advised that defendant's case would be called for trial and a jury would be needed.

The Confrontation Clause in Article I, Section 23 of North Carolina's Constitution "guarantees the right of . . . defendant to be present at *every stage* of the trial." *State v. Smith*, 326

N.C. 792, 794, 392 S.E.2d 362, 363 (1990). In a capital trial this right is not waivable. *Id.*

> The process of selecting and impaneling the jury is a stage of the trial at which the defendant has a right to be present. Therefore, it was error for the trial court to exclude the defendant, counsel, and the court reporter from its private communications with the prospective jurors at the bench prior to excusing them.

*Id.; accord State v. Boyd*, 332 N.C. 101, 418 S.E.2d 471 (1992); *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992); *State v. Johnston*, 331 N.C. 680, 417 S.E.2d 228 (1992); *State v. McCarver*, 329 N.C. 259, 404 S.E.2d 821 (1991).

Defendant's constitutional right to be present at all stages of the trial is by definition a right pertaining to the trial itself. It does not arise before the trial begins. *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716.

In *Cole* the trial court opened the session of court on Monday, 17 July 1989, and began selection of the grand jury. Considering requests for juror excusals, the court held off-the-record bench conferences with a number of prospective jurors called for duty during that session of court. Some of these jurors were excused or deferred from service. The grand jury was selected and the remaining jurors were given the oath and dismissed until the following morning. On Tuesday, 18 July 1989, defendant's case was called for trial and jury selection began for that case. During the jury selection process on Wednesday, 19 July 1989, the trial court again conducted unrecorded bench conferences with individual jurors who had been newly called for service on that day. Neither defendant nor his counsel were present at these conferences. Some of these jurors were excused for reasons which the record did not reveal. The court, while finding reversible error in the excusal of the jurors on Wednesday, held that

> it was not error for the court to excuse prospective jurors after the unrecorded bench conferences on [Monday,] 17 July 1989. The defendant's trial had not commenced at that time. The jurors were not excused at a stage of the defendant's trial and the defendant did not have a right to be present at the conferences.

*Id.* at 275, 415 S.E.2d at 717.

Here, as in *Cole*, defendant's trial had not begun when the complained of unrecorded bench conferences with prospective jurors took place. They occurred, again as in *Cole*, on Monday, the beginning day of the session, before any case had been called for trial. *Cole* controls this assignment of error adversely to defendant's position; the assignment is therefore overruled.

## III.

[2] Defendant next contends the trial court erred by prohibiting defendant's rehabilitation of four prospective jurors who were excused for cause because of their views on capital punishment. Defendant concedes that three of these jurors expressed their unequivocal opposition to the death penalty and that the trial court's discretion was not abused in disallowing defense attempts to elicit different answers. *See State v. Smith*, 328 N.C. 99, 129, 400 S.E.2d 712, 729 (1991). Defendant argues that the trial court erred in not permitting further examination by defendant of a fourth juror whose responses to *voir dire* questioning about the death penalty were ambiguous:

MR. HAIGWOOD: [D]o you have an opinion one way or the other about what ought to happen to the person who did whatever it was that happened?

JUROR: Yes and no.

MR. HAIGWOOD: Yes and no?

JUROR: Yes and no.

MR. HAIGWOOD: Okay. So in part you have an opinion about what punishment ought to be imposed and in part you do not have an opinion; is that what you are saying?

JUROR: Yes, that is what I am saying.

MR. HAIGWOOD: Is that an opinion that you can set aside—let me ask you—let me see if—have you expressed that opinion to anyone?

JUROR: My family.

MR. HAIGWOOD: Your family?

JUROR: My family.

MR. HAIGWOOD: And do you hold that opinion at this point?

JUROR: Yes.

MR. HAIGWOOD: That is you hold to an opinion as to what ought to happen to a person—at least in part as to what ought to happen to the person who did whatever happened?

JUROR: Not so much as to what should happen but maybe what should not happen.

MR. HAIGWOOD: As far as punishment?

JUROR: Yes.

MR. HAIGWOOD: Does that relate—and I'm not asking you what your opinion is, but does that relate to the imposition of the death penalty or life imprisonment?

JUROR: The death penalty—

MR. HAIGWOOD: Excuse me. It does relate to that?

JUROR: Yes, it does.

MR. HAIGWOOD: Would you be able to set that opinion aside at this point and—well, you have such an opinion at this point?

JUROR: Yes, I do.

MR. HAIGWOOD: Your Honor, we would challenge for cause.

THE COURT: All right. You can stand aside.

Assuming that it was error for the trial court not to permit defendant to attempt to rehabilitate this juror, because defendant received a life sentence, the error is harmless. Essentially defendant argues that this juror was improperly excused for cause because of the juror's views on the death penalty and that had defendant been permitted to question the juror, he could have demonstrated that the juror was not disqualified because of these views. Even so, because the improper excusal of a juror in violation of the principles of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), affects only the sentencing proceeding and not the determination of defendant's guilt, any error relating to such an excusal is harmless unless defendant receives a death sentence which, absent the error, would be sustained on appeal. *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990); *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981);

*State v. Montgomery*, 291 N.C. 235, 229 S.E.2d 904 (1976); *State v. Covington*, 290 N.C. 313, 226 S.E.2d 629 (1976); *State v. Cook*, 280 N.C. 642, 187 S.E.2d 104 (1972); *State v. Williams*, 275 N.C. 77, 165 S.E.2d 481 (1969). There is, therefore, no merit to this assignment of error.

IV.

[3]  Defendant also contends the trial court committed reversible error in its handling of a potential juror who expressed reservations about jury duty because of his concern that the trial might interfere with future personal plans.

Asked by the district attorney whether any members of the jury pool had any "pressing personal or business engagements" on their minds such that they could not give the case their full attention, one potential juror responded that he was due to start nursing school at the end of the month, that he was on a scholarship, and that he was concerned the trial would overlap with the beginning of school. Assured by the district attorney that the trial would not go to the end of the month, the juror nevertheless doubted he could give the case the attention it deserved because his plans to attend school would "still [be] in the back of my mind." The trial court, apparently perturbed by this reaction, instructed the juror as follows:

> Well, you are going to sit here through the trial of the case, but I'm not going to require you to sit on this case. So when the other jurors are excused, you are to remain in the courtroom. . . . I want you to sit on the front row, sir, so you can hear what's going on.

Defendant contends the trial court's treatment of this juror "chilled" the honest responses of other members of the venire, jeopardizing defendant's ability to obtain a fair and impartial jury. Defendant points to nothing in the record relating to the examination of other jurors that substantiates this contention. It could just as well be argued that the court's reaction to the juror's response reinforced among the other prospective jurors the need to be forthright and honest in their answers. Defendant's argument, therefore, relies on mere speculation and must, for that reason, be rejected.

## V.

Defendant next contends the trial court committed reversible error in permitting the Virginia police officers involved in defendant's apprehension to testify about other crimes and wrongful acts committed by defendant. Defendant moved before trial to suppress this evidence, and the trial court denied the motion.

The complained of testimony was: (1) The arresting officer, Ronald Smith, charged defendant with driving while impaired and defendant refused to submit to a breathalyzer test. (2) Defendant stole the vehicle in which he was riding. (3) Defendant struck his girlfriend when she told him she had left her purse in the victim's truck. (4) Defendant stole the .22 caliber pistol with which he shot the victim.

Defendant argues this testimony should have been excluded because its only purpose was to prove defendant's bad character and that he acted in conformity therewith in violation of Evidence Rule 404(b). The rule provides:

> Other crimes, wrongs, or acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment, or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1988).

The complained of evidence was clearly admissible under Rule 404(b). The rule states "a clear, general rule of *inclusion* of relevant evidence of other crimes, wrongs, or acts." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990) (emphasis in original). Under the rule, "evidence of other offenses is admissible so long as it is relevant to any fact or issue other than the character of the accused." *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986). Only when the evidence of other crimes or wrongs has no other probative value than to show the bad character of the accused in order to prove his "propensity or disposition to commit an offense of the nature of the crime charged" should the evidence be excluded. *State v. Coffey*, 326 N.C. at 279, 389 S.E.2d at 54.

STATE v. RANNELS

[333 N.C. 644 (1993)]

[4] The complained of evidence was clearly relevant to issues in the case other than defendant's character. Defendant's having been charged with driving while impaired explains circumstances under which he was taken into custody by Officer Smith. Defendant's refusal to take a breathalyzer test, if a wrongful act at all, explained the circumstances under which defendant was kept waiting in the Virginia Public Safety Center. It was during this time that defendant confessed to the crimes for which he was on trial. All of this evidence tended ultimately to show the circumstances under which that confession was made. It was thus relevant on the issues of the confession's voluntariness and credibility. The evidence cast more light on these important questions than it did on defendant's character. Its probative value, therefore, outweighed its prejudicial effect under Evidence Rule 403.

[5] The other evidence related directly to the question of defendant's guilt of the crimes charged. That he had stolen the vehicle which he wrecked in Virginia and that he beat his girlfriend when he learned she had left her purse in the victim's truck both bear on defendant's consciousness of guilt. His theft of the car tends to show that he was, indeed, desperate to flee from the area of the crime — so desperate that he resorted to stealing to acquire his mode of transportation. His beating of his girlfriend for leaving her purse in the victim's truck shows that defendant was angry because he felt that her purse would lead to the discovery of his crimes. That defendant stole the murder weapon tends to prove not only that he possessed it but the circumstances under which he acquired it. This kind of evidence is generally admissible in a homicide prosecution as tending to prove the guilt of the accused. See State v. Garner, 331 N.C. 491, 417 S.E.2d 502 (1992); State v. Williams, 292 N.C. 391, 233 S.E.2d 507 (1977); State v. Van Landingham, 283 N.C. 589, 197 S.E.2d 539 (1973).

VI.

Defendant next argues that the trial court erroneously denied his motion to dismiss all charges for insufficiency of the evidence. We conclude the evidence is sufficient to be submitted to the jury on all charges.

"On a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it." State v. Locklear, 322 N.C. 349, 358, 368 S.E.2d 377, 382 (1988). The question for

the court is whether substantial evidence — direct, circumstantial, or both — supports each element of the offense charged and defendant's perpetration of that offense. *See id.* at 358, 368 S.E.2d at 383; *State v. Bates*, 309 N.C. 528, 533-34, 308 S.E.2d 258, 261 (1983). " 'Substantial evidence' is that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Cox*, 303 N.C. 75, 87, 277 S.E.2d 376, 384 (1981).

[6] The evidence was sufficient to support a conviction for conspiracy to commit robbery. A criminal conspiracy is "an agreement between two or more persons to do an unlawful act or do a lawful act in an unlawful way or by unlawful means." *State v. Abernathy*, 295 N.C. 147, 164, 244 S.E.2d 373, 384 (1978); *accord State v. Le Duc*, 306 N.C. 62, 75, 291 S.E.2d 607, 615 (1982). In order to be guilty as a conspirator, it must "be established by competent evidence that [defendant] entered into an unlawful confederation for the criminal purposes alleged." *State v. Andrews*, 216 N.C. 574, 577, 6 S.E.2d 35, 37 (1939). The conspiracy "may be . . . established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933).

The following evidence supports the charge of defendant's conspiracy to commit robbery: Officer Smith, who arrested defendant in Virginia, testified that defendant told him that he and Linda Lopez went to the bar "to set this guy up . . . so they could rob him." Officer Curran, called in to sit with defendant when Smith left the room in which defendant was being detained, testified that defendant told him

> that he and his girlfriend, Linda Lopez, had planned on robbing a man at a bar, and that he and Linda went to this bar and met this man. Linda talked to the man, and after awhile that Linda Lopez and the man left the bar, and that he followed them; and the man and Linda Lopez got into a truck; he followed them as they drove off.

The witness Melofsky, Ramada Inn's food and beverage director, testified that he observed defendant and Lopez engage the victim in conversation and leave the lounge with the victim with defendant walking on the victim's left side and Lopez "hanging on Mr. Gaddy's arm on the right side." This is ample evidence tending to establish

a criminal conspiracy on the part of defendant and Lopez to rob the victim.

[7]   The evidence is also ·sufficient to support defendant's conviction of the armed robbery of the victim. Defendant contends that since his confession contains no mention of the robbery of Gaddy and the State is bound by the confession which it offered in evidence, this charge should not have gone to the jury.

We disagree. First, the confession does not deny that defendant robbed the victim; it is merely silent on the subject. The confession, therefore, is not evidence that defendant did not rob the victim. Second, there is plenary other evidence in the case from which the jury could infer beyond a reasonable doubt that defendant did commit the armed robbery. Defendant's confession expressed his intent to rob. According to his confession he and Lopez lured Gaddy from the lounge for the purpose of robbing him, and defendant later shot Gaddy to death at a secluded spot where he had been led by either defendant or Lopez. Gaddy habitually carried "right much money on him, mostly cash money" and "kept his billfold in his left back pocket, and he also kept paper money in his pockets . . . ." Gaddy was found dead with no wallet, or billfold, on his person, with one of his front pockets turned inside out and his back left pocket "loose." This back pocket appeared to have "held some item or some item had been removed from the pocket." The pathologist found only Gaddy's wristwatch on his wrist and a few coins in the right side pants pocket.

While, as defendant insists, it is possible that Gaddy could have been robbed by someone else between the time defendant killed him and his body was discovered, the evidence is more than sufficient for a jury to infer to the contrary and to conclude beyond a reasonable doubt that defendant carried out his plan to rob Gaddy of his money and did so with the use or threatened use of the .22 caliber pistol.

[8]   Defendant argues that the evidence was insufficient to support his conviction of first-degree murder on a theory of premeditation and deliberation. Defendant again contends that his pretrial confession shows that he shot Gaddy in a fit of anger because Gaddy fondled Lopez and the State, having offered this confession in evidence, is bound by it. Defendant relies on familiar principles of law defining the concepts of premeditation and deliberation: "If . . . the purpose to kill is formed simultaneously with the killing,

then there is no premeditation and deliberation." *State v. Faust*, 254 N.C. 101, 109-10, 118 S.E.2d 769, 774, *cert. denied*, 368 U.S. 851, 7 L. Ed. 2d 49 (1961).

> Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. . . . Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation.

*State v. Brown*, 315 N.C. 40, 58, 337 S.E.2d 808, 822 (1989), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986) (citations omitted).

> Although there may have been time for deliberation, if the purpose to kill was formed and immediately executed in a passion, especially if the passion was aroused by a recent provocation or by mutual combat, the murder is not deliberate and premeditated. However, passion does not always reduce the crime since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect.

*State v. Faust*, 254 N.C. at 108, 118 S.E.2d at 773 (quoting 40 C.J.S., *Homicide*, § 33(d), at 889-90 (1944)). We again disagree.

Even if defendant's confession, taken at face value, shows that his shooting of Gaddy was the result of "a violent passion, suddenly aroused by lawful or just cause or legal provocation" and not premeditation and deliberation as these concepts have been defined, the State is not bound by these aspects of the confession.

> "When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements. . . . When the State's evidence and that of the defendant are to the same effect and tend only to exculpate the defendant, motion for nonsuit should

be allowed. *State v. Carter*, 254 N.C. 475, 119 S.E.2d 461." *State v. Johnson*, 261 N.C. 727, 730, 136 S.E.2d 84, 86 (1964).

. . . .

[T]he State is not bound by the exculpatory portions of a confession which it introduces, if there is "other evidence tending to throw a different light on the circumstances of the homicide." *State v. Bright*, 237 N.C. 475, 477, 75 S.E.2d 407, 408 (1953); see also *State v. Bolin*, 281 N.C. 415, 189 S.E.2d 235 (1972), and *State v. Cooper*, 273 N.C. 51, 159 S.E.2d 305 (1968).

*State v. Hankerson*, 288 N.C. 632, 637, 220 S.E.2d 575, 580 (1975), *judgment rev'd on other grounds*, 432 U.S. 233, 53 L. Ed. 2d 306 (1977).

Here there is other evidence tending to throw a different light on the homicide than that contained in defendant's confession — evidence, indeed, which tends to contradict defendant's confession and which would permit the jury reasonably to conclude that defendant murdered the victim with premeditation and deliberation. There is, as we have shown, evidence that defendant and Lopez planned to rob the victim. In preparation for the robbery, defendant loaded the .22 caliber pistol and placed it where it would be available at the time of the robbery. Gaddy's dead body was found underneath the steering wheel with a glass between his legs and a burned down cigarette between two fingers of his left hand. The fatal wound was to Gaddy's left temple and fired from a distance of two to three inches. When defendant learned Lopez had left her purse in the truck, he beat her and left her. When defendant after his arrest was told that Lopez was in jail, his attitude was cavalier, and he expressed a total lack of concern or affection for her.

The foregoing evidence belies defendant's pretrial version of how his murder of Gaddy occurred. That Gaddy was found dead with a glass between his legs and a cigarette in his hand makes it unlikely the shooting was preceded by some physical scuffle between Gaddy and defendant. Defendant's beating and abandonment of Lopez shortly after the murder when he learned she had left her purse and his cavalier attitude toward Lopez upon being informed of her arrest cast doubt on his statement that he became angered by her being fondled by Gaddy as does the very plan concocted by defendant and Lopez, a plan grounded in Lopez's ability to lure Gaddy to a secluded spot presumably with the promise of sexual favors. The position of Gaddy's body in the truck—

slumped under the steering wheel—the wound to his left temple fired at close range, the cigarette in his left hand and the glass between his legs constitutes some evidence that the killing was not suddenly provoked but was carefully planned and executed.

On this state of the evidence the jury could reasonably infer that defendant's pretrial statement regarding how the killing occurred was not true and was made by defendant solely for the purpose of mitigating his true culpability in the homicide. From the evidence just recounted the jury could reasonably conclude that defendant methodically planned to kill his robbery victim when he loaded the pistol and took steps to make sure it was available at the scene of the robbery and that he methodically carried out these plans when he, Lopez and Gaddy arrived at the secluded spot where the robbery and murder took place.

For these reasons, we hold the evidence was sufficient to support all defendant's convictions, including first-degree murder on theories of both premeditation and deliberation and felony murder.

## VII.

[9] Next defendant argues the trial court committed reversible error by not complying with defendant's request to instruct the jury that "the intent to kill cannot occur simultaneously with the killing." This request came after the trial court had given its instructions but before the jury retired to begin its deliberations. The request was timely, N.C. R. App. P. 10(b)(2); but the trial court denied it.

Although defendant's request is a correct statement of law, e.g., State v. Cummings, 323 N.C. 181, 188, 372 S.E.2d 541, 547 (1988), judgment vacated on other grounds, 494 U.S. 1021, 108 L. Ed. 2d 602 (1990), we find no error in its being denied because the trial court had already given the instruction in substance. The trial court charged the jury that in order for it to find defendant guilty of first-degree murder based on premeditation and deliberation, the State must prove

> that the defendant acted after premeditation. That is, that he formed the intent to kill the victim over some period of time, however short, before he acted.
>
> And . . . that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind.

This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect.

The trial court is not required to give requested instructions verbatim; it suffices if the instructions are in substantial conformity with those requested. *See State v. Faust*, 254 N.C. at 109, 118 S.E.2d at 774. Here the trial court's charge to the jury distinguished an intent to kill formed "under the influence of some suddenly aroused violent passion," from the intent to kill formed after premeditation and deliberation. This charge conforms in substance with that requested by defendant.

## VIII.

**[10]** Defendant next asserts the trial court erred in refusing to arrest judgment on defendant's armed robbery conviction. He concedes that our precedents are against him on this issue, but he requests that we reexamine them.

Our precedents are quite clear and we decline to overturn them.

> [W]hen the jury's verdict *specifies both* theories in its verdict of murder in the first degree, it is the court's decision, not that of the jury, to select the theory on which the sentence for the homicide is to be based. And where the sentence for homicide rests upon the premeditated and deliberate murder conviction, the merger rule does not apply.

*State v. Fields*, 315 N.C. 191, 206-07, 337 S.E.2d 518, 527-28 (1985). When both theories of felony murder and premeditation and deliberation are submitted but the jury does not specify the basis for its verdict of first-degree murder, the verdict is treated as one based on felony murder and the merger rule applies. *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450; *State v. Tatum*, 291 N.C. 73, 229 S.E.2d 562 (1976).

Here the jury specified in its verdict that it found defendant guilty of first-degree murder on theories of *both* felony murder and premeditation and deliberation. The underlying felony submitted to the jury on the felony murder theory was armed robbery.

The jury also returned verdicts finding defendant guilty of armed robbery and conspiracy to commit robbery. As to the murder and armed robbery conviction, therefore, the merger rule has no application; and it was proper for the trial court to sentence defendant on both the murder conviction and the armed robbery conviction. *State v. Fields*, 315 N.C. 191, 337 S.E.2d 518.

## IX.

[11] Finally defendant asks us to allow a motion for appropriate relief by which he seeks a new sentencing hearing in the armed robbery case. We conclude this motion must first be determined in the Superior Court where it was filed when that court still had jurisdiction over the case.

Defendant's motion for appropriate relief was filed in the trial court on 30 August 1989 after his notice of appeal was given on 22 August 1989. The judgments against defendant in all cases were also entered on 22 August 1989. On 15 October 1990 Judge Frank R. Brown ordered that a hearing be held in Superior Court, Pitt County on defendant's motion.

It is only when a case is pending in the appellate division that a motion for appropriate relief is cognizable here. N.C.G.S. § 15A-1418(a). A case is deemed to be pending in the appellate division "when the jurisdiction of the trial court has been divested as provided in G.S. 15A-1448, or when a petition for writ of certiorari has been granted." *Id.* Section 15A-1448 of the North Carolina General Statutes provides:

(a) Time for Entry of Appeal; Jurisdiction over the case.—

(1) A case remains open for the taking of an appeal to the appellate division for a period of 10 days after the entry of judgment.

(2) When a motion for appropriate relief is made during the 10-day period, the case remains open for the taking of an appeal until the expiration of 10 days after the court has ruled on the motion.

(3) The jurisdiction of the trial court with regard to the case is divested, except as to actions authorized by G.S. 15A-1453, when notice of appeal has been given and the period described in (1) and (2) has expired.

At the time defendant's motion for appropriate relief was filed in the trial court the jurisdiction of the trial court had not been divested under N.C.G.S. § 15A-1448(a)(3). The case, therefore, was not then pending in the appellate division as provided by N.C.G.S. § 15A-1418. Since the case was not then pending in the appellate division, the motion is not properly cognizable here. It must first be determined in the trial court which had jurisdiction over it when it was filed and as Judge Brown recognized when he ordered that it be heard in the Superior Court.

The result is:

NO ERROR.

Justices MEYER and PARKER did not participate in the consideration or decision of this case.